IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| STEVEN C. LOGSDON, | |
|---|---|
| Plaintiff, | 8:15-CV-232 |
| vs. | |
| BNSF RAILWAY COMPANY, | MEMORANDUM AND ORDER |
| Defendant. | |

The plaintiff, Steven Logsdon, is suing his former employer, BNSF Railway, for alleged violations of the Federal Railroad Safety Act, 49 U.S.C. § 20101, *et seq.*, and the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* BNSF has moved for summary judgment on both claims. For the reasons explained below, BNSF's motion will be granted in part, and denied in part.

BACKGROUND

The following facts are not meaningfully disputed. Logsdon began his employment with BNSF as a laborer in 2006. Filing 126 at 1. He worked in that position, and later as a first line supervisor, until his termination on August 27, 2013. Filing 126 at 13. Throughout his employment, Logsdon worked in the railroad's maintenance shop in Alliance, Nebraska, where he assisted in the repair of damaged coal cars.

Generally speaking, when a damaged coal car enters the Alliance facility, certain precautionary measures must be performed before it reaches a BNSF carman—the employee who is ultimately responsible for repairing the railcar. One such measure is the removal of "residual" coal, which can sometimes stick to the bottom or sides of a railcar due to cold weather or moisture. Filing 126 at 14. Typically, when the removal process is performed

inside the facility, a BNSF carman opens the railcar's "dump doors," causing the coal to fall onto heavy cardboard paper—or "slip paper"—which is placed underneath each opening. Filing 126 at 15. A laborer then bends down, slides the coal-laden slip paper from under the railcar, and shovels the coal into a nearby dumpster. Filing 126 at 15.[1]

Logsdon alleges that he was injured in September 2012 while removing coal that was dumped inside of the Alliance maintenance facility. Specifically, Logsdon claims that he was pulling slip paper from under a railcar when his back "popped," causing immediate pain in his shoulders and chest. Filing 127-2 at 2. The slip paper, Logsdon estimates, contained 150 to 200 pounds of coal. Filing 126 at 16.

Logsdon did not immediately report the incident to management. But approximately 3 months later, on January 16, 2013, he met with his direct supervisor, Andrew Callahan. Filing 126 at 3. According to Logsdon, Callahan provided him with a company injury form, which Logsdon began filling out. But as Logsdon started describing the slip paper incident, Callahan allegedly grabbed the form and threw it away. Filing 126 at 20. According to Logsdon, Callahan explained that he would not allow another "reportable injury," and instructed Logsdon to start over with a new report.[2] Filing 126 at 20; filing 127-2 at 4. Callahan then allegedly dictated to

---

[1] This task can also be performed outdoors. When that is the case, however, a private contractor—as opposed to BNSF employees—is called in to clean it up. The decision as to where to dump the coal (either inside or outside) is at the discretion of the carmen.

[2] "Reportable" injuries are those that occur as a direct result of a workplace function. According to Logsdon, the Alliance facility had experienced a spike in reportable injuries in 2012—including one accident that resulted in death. Filing 127-2 at 6. Callahan was allegedly "under pressure for all these other injuries," which fueled his alleged anger toward Logsdon during their January 16 interaction. Filing 127-2 at 6; filing 126 at 22.

Logsdon the substance of the report—making sure that the cause of injury was not attributable to a specific workplace event. Rather, Logsdon says, Callahan made him list as the cause of his injury: "Pain Accumulated over a Period of Time." Filing 125-6 at 27; filing 126 at 20. Logsdon claims that he went along with Callahan's alleged demands out of fear of termination, and ultimately submitted a report without any reference to the slip paper incident. *See* filing 125-6 at 27.

BNSF held a standard hearing on Logsdon's injury report on May 29, 2013. Filing 126 at 4. At the hearing, Logsdon informed the claims administrator that he was injured while pulling slip paper from underneath a railcar. Filing 125-6 at 55. But that explanation conflicted with his earlier description on the incident report—*i.e.*, that the injury stemmed from a condition that had deteriorated over time. Filing 125-6 at 27. So, based on these inconsistencies, BNSF opened a separate investigation into Logsdon's "conduct/dishonesty" in reporting the underlying injury. *See* filing 126 at 5. As part of this investigation, the railroad held a hearing, in which Logsdon was permitted to testify, call witnesses, and submit evidence on his own behalf. There, Logsdon admitted that his January injury report, to the extent that it omitted the slip paper incident, was inaccurate. But, he argued, such inaccuracies were the result of intimidation that he endured at the hands of his supervisor, Callahan. Filing 126 at 7; filing 125-10 at 7. Logsdon submitted evidence on this point, including a handwritten note that he allegedly wrote (and kept) after the January 16 meeting with Callahan, and an email that he had sent to a union official. *See*, filing 125-6 at 29; filing 125-6 at 65.

Callahan also testified at the investigatory hearing. He acknowledged meeting with Logsdon on January 16, but denied Logsdon's description of

events. According to Callahan, Logsdon never mentioned the slip paper incident, and he (Callahan) at no point demanded that Logsdon lie or omit information regarding the injury. Filing 125-10 at 9; filing 125-5 at 12.

The transcript of the investigatory hearing and all accompanying exhibits were sent to BNSF's "PEPA" department for review. Filing 126 at 9. That department is charged with overseeing the railroad's discipline process, and making initial determinations as to whether disciplined employees can and should be terminated. Filing 126 at 9; filing 125-10 at 3. After reviewing the documents in this case, Derek Cargill, the Director of Labor Relations, recommended that Logsdon be dismissed for dishonesty—which is, as both parties acknowledge, a standalone dismissible offense. Filing 124 at 4; filing 126 at 3; filing 126 at 9; filing 125-10 at 5. Cargill later testified that his decision was based on discrepancies in Logsdon's story, and on credibility determinations of the testifying witnesses. *See* filing 125-10 at 9. Cargill's recommendation was then sent to Brandon Mabry, an Assistant Vice President, who—according to BNSF[3]—made the final decision regarding Logsdon's termination. Filing 126 at 12; filing 125-10 at 6; filing 125-16 at 1-2. Logsdon was informed of this decision, and officially dismissed from BNSF's employ, on August 27, 2013. Filing 126 at 13.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes

---

[3] Logsdon does not dispute that the assistant vice president reviewed the document. But, he argues, Derek Cargill made the final termination decision. Filing 126 at 12, 24.

demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The existence of a mere scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## ANALYSIS

Logsdon has sued BNSF, alleging violations of the Federal Railroad Safety Act (FRSA) and the Federal Employers' Liability Act (FELA). Logsdon generally alleges that BNSF breached its non-delegable duty "to provide Plaintiff with a reasonably safe place to work," which contributed to his September 2012 workplace injury. Filing 1 at 2-5. He further contends that he was fired for reporting his injury to his supervisor in violation of the

FRSA. BNSF has moved for summary judgment on both claims, which the Court will address, in turn, below.

## A. FELA

Logsdon's FELA claim is premised on his September 2012 injury, in which Logsdon allegedly hurt his back and chest while pulling slip paper from under a railcar. According to Logsdon, that injury was due in whole or in part to BNSF's negligence in failing to provide a reasonably safe work environment. BNSF moves for summary judgment, arguing that the injury was not reasonably foreseeable, and therefore not actionable in negligence.

Enacted in 1908, FELA provides railroad employees with a federal cause of action for injuries "resulting in whole or in part from the negligence" of the railroad. 45 U.S.C. § 51. The statute imposes upon employers a continuous duty to provide a reasonably safe place to work. *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 889 (8th Cir. 2012). FELA is to be liberally construed, but it is not a workers' compensation statute, and the basis of liability is "negligence, not the fact that injuries occur." *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). So, Logsdon must prove the customary common law elements of a negligence claim: duty, breach, foreseeability, and causation. *Crompton v. BNSF Ry. Co.*, 745 F.3d 292, 296 (7th Cir. 2014); *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006). However, the Court applies a relaxed standard of causation under the FELA. *CSX Transp., Inc. v. McBride*, 564 U.S. 685 (2011). "Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.*

BNSF argues that the coal removal process as described above is reasonably safe, and therefore that Logsdon's alleged injuries were not

"foreseeable" under the circumstances. This argument derives in part from the railroad's applicable duty of care, which the Eighth Circuit has summarized as

> the degree of care that persons of ordinary, reasonable prudence would use under similar circumstances and by what these same persons would anticipate as resulting from a particular condition. In other words, the employer's duty under FELA to maintain a safe workplace turns in a general sense on the reasonable foreseeability of harm. Thus, an employer is not liable if it had no reasonable way of knowing about the hazard that caused the employee's injury.

*Peyton v. St. Louis Southwestern Ry. Co.*, 962 F.2d 832, 833 (8th Cir. 1992) (internal quotations and citations omitted); *see*, *Burckhard v. BNSF Ry. Co.*, 837 F.3d 848, 853-54 (8th Cir. 2016); *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 896 (8th Cir. 2012). Here, BNSF argues, it could not have reasonably anticipated that the particular condition (pulling slip paper) would or might result in injury. *See McBride*, 564 U.S. at 703.

BNSF supports this argument with various references to the record which, it argues, underscores the overall safety of its coal removal process.[4] For example, the railroad has submitted a report from a biomechanics and mechanic engineering expert who generally concludes that the coal-pulling task "is not inherently strenuous or dangerous . . . from a biomechanical

---

[4] It is unclear if BNSF still relies on this process. At least one witness testified that residual coal is now dumped outdoors, and that laborers are no longer expected to pull slip paper. Filing 125-13 at 3. BNSF does not explicitly confirm or deny this statement, claiming that its current procedures are "irrelevant." Filing 130 at 13.

perspective." *See*, filing 124 at 15; filing 125-3 at 18-19. It points to safety mechanisms—such as the availability of long-handled shovels—which Logsdon was aware of, but declined to use. Filing 124 at 27. And it cites Logsdon's testimony, in which he "admit[s]" that he has no explanation for the alleged injury: "I can't tell you exactly what went wrong. I'd done the task before. For whatever reason, and I cannot tell you, it just popped." *See*, filing 124 at 33; filing 125-6 at 9.[5] Accordingly, BNSF argues, it was not aware that the coal removal process would (or could) result in injury or harm.

Logsdon disputes this claim, arguing that his injuries were reasonably foreseeable under the circumstances. To support this contention, Logsdon cites requests that he made to BNSF management in the months leading up to the September 2012 incident. One such request was that BNSF discontinue its practice of dumping residual coal inside of the Alliance facility. After all, when the coal is dumped outdoors, a private contractor is responsible for cleaning it up. *See*, filing 126 at 51; filing 125-6 at 20. And that contractor uses a sophisticated "vacuum truck," which mechanically removes the coal without the need for manual labor. Filing 125-11 at 3. Thus, Logsdon claims, when the coal is dumped outside, "[e]mployees of BNSF are faced with no risk of . . . injury." Filing 126 at 51. Relatedly, Logsdon claims that various employees, including himself, voiced concerns in 2012 about the shortage of laborers during any given shift. *See* filing 125-5 at 5. These complaints were largely ignored which, he says, likely contributed to the September 2012 incident.

---

[5] BNSF cites other statements by Logsdon which, it claims, strengthen its argument. For example, in his deposition, Logsdon says that there was nothing that he could have done differently to prevent his injury, and that there was no identifiable defect in the railroad's coal-removal equipment. *See* filing 125-6 at 20.

BNSF acknowledges that Logsdon and others complained about the lack of available manpower and, potentially, about the need to dump residual coal outdoors. Filing 130 at 25. But, it argues, those complaints do not create a genuine issue of fact for trial. After all, vague requests for additional manpower do not, without more, alert an employer to the specific dangers of a particular task. And because there is "no evidence" that Logsdon's complaints had "anything to do with the task of cleaning up residual coal within the car shop," it cannot be said that BNSF knew of—and otherwise ignored—potential hazards. Filing 130 at 26.

But according to Logsdon, the aforementioned complaints *were* directed at management, and pertained—at least in part—to the specific task at issue: pulling slip paper. And based on those warnings (and the discretionary nature of the task more generally), a reasonable jury could conclude that BNSF had a "basis to anticipate that employees . . . would or might sustain an injury from performing this work practice." Filing 126 at 52. Viewing the facts in the light most favorable to Logsdon, the Court determines that this dispute is a matter for a jury to resolve, and will therefore deny BNSF's motion for summary judgment. *See Ackley v. Chicago & N.W. Transp. Co., 820 F.2d 263, 267 (8th Cir. 1987)* ("[t]he Supreme Court has emphasized the jury's role in determining whether an employer has breached its duties under the FELA"). Indeed, based on the evidence adduced, a trier of fact could conclude that BNSF knew, or should have known, of potential dangers associated with the railroad's process for removing residual coal. Accordingly, BNSF's motion for summary judgment on Logsdon's FELA claim is denied.

## B. FRSA

Logsdon next contends that he was fired for reporting the injury to his supervisor in violation of the FRSA. BNSF moves for summary judgment,

arguing that Logsdon's injury report was not a contributing factor to his dismissal. *See* filing 124 at 19.

The purpose of the FRSA is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *see CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 661-62 (1993). As relevant, the FRSA provides that a railroad "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee" if that discrimination is based on the employee's attempt "to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee." 49 U.S.C. § 20109(a)(4). FRSA's implementing regulations further provide that to "discriminate" against an employee includes, but is not limited to, "intimidating, threatening, restraining, coercing, blacklisting, or disciplining an employee." 29 C.F.R. § 1982.102(b)(1)(iv). An employee may obtain de novo review of a retaliation claim in federal court after exhausting administrative remedies. 49 U.S.C. § 20109(d)(3).

Logsdon's prima facie case requires him to show (i) he engaged in a protected activity; (ii) the defendant knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. *Kuduk v. BNSF Ry. Co.,* 768 F.3d 786, 789 (8th Cir. 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)). If he makes this showing, BNSF is nonetheless not liable if it demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of his protected activity. *Id*. (citing 49 U.S.C. § 42121(b)(2)(B)(ii)).

Here, Logsdon has satisfied the first three elements of his prima facie case. He engaged in protected activity in submitting an injury report, BNSF knew about it, and Logsdon was ultimately terminated from the railroad's employ. The dispute, however, is over the fourth element—whether Logsdon's protected activity contributed to the railroad's decision to dismiss him.

A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Kuduk,* 768 F.3d at 791 (quoting Procedures for the Handling of Retaliation Complaints under the Federal Railroad Safety Act, 75 Fed. Reg. at 53,524). The contributing-factor standard is more lenient than the causation standard applied in other employment-retaliation contexts, and it "does not require that the employee conclusively demonstrate the employer's retaliatory motive." *Kuduk,* 768 F.3d at 791 (quoting *Coppinger-Martin v. Solis,* 627 F.3d 745, 750 (9th Cir. 2010)). But as the Eighth Circuit has recently clarified, it is not enough for an FRSA claimant to show a mere factual connection between the protected activity and his or her termination. Rather, the claimant must show that the employer's discipline was, at least in part, "intentional retaliation prompted by his injury report." *Heim v. BNSF Ry. Co.,* 849 F.3d 723, 727 (8th Cir. 2017).

As noted throughout, Logsdon's FRSA claim is premised on the injury report that he submitted to the railroad on January 16, 2013. There, as described above, Logsdon listed as the cause of injury: "Pain Accumulated over a Period of Time." Filing 125-6 at 27; filing 126 at 20. At a subsequent hearing, however, Logsdon changed his story, attributing the injury instead to a specific workplace event (pulling slip paper). The discrepancy in these reports caught the attention of the railroad's management, who decided to open a separate investigation into potential dishonesty—a standalone

dismissible offense. Filing 124 at 4; filing 126 at 3. The records from that hearing were then forwarded to Derek Cargill, and later Brandon Mabry, who ultimately decided to terminate Logsdon's employment.

It is against that backdrop that BNSF moves for summary judgment, arguing that its decision was based *entirely* on its good faith finding of dishonesty. Filing 124 at 23. Indeed, several layers of management reviewed the underlying records, which included *both* the discrepancies in Logsdon's reporting, *and* Logsdon's allegations of managerial misconduct. After reviewing that evidence, and weighing the credibility of witnesses (Callahan and Logsdon), BNSF asserts that senior management determined—"in good faith"—that Logsdon had been dishonest, and therefore terminated his employment on those grounds. *See* filing 124 at 24-26. Thus, the railroad argues, because the "undisputed evidence" shows that Logsdon was dismissed on a non-retaliatory basis, he cannot maintain an action under the FRSA. Filing 124 at 26.

But according to Logsdon, the alleged dishonesty was not, as BNSF asserts, the sole motivating factor behind his dismissal. Rather, Logsdon argues that the adverse employment action was based, at least in part, on impermissible discriminatory animus. *See* filing 126 at 36. And that animus is evidenced by, among other things, the railroad's "shifting explanations" as to why Logsdon was ultimately fired. Thus, according to Logsdon, BNSF's motion for summary judgment must be denied.

### 1. SHIFTING EXPLANATIONS

Discriminatory animus is often shown through circumstantial evidence. *Gunderson v. BNSF Ry. Co.*, 2015 WL 4545390, at \*9 (D. Minn. 2015). Circumstantial evidence may include evidence of "a temporal proximity, pretext, shifting explanations by the employer, antagonism or hostility

toward the plaintiff's protected activity, the falsity of the employer's explanation or a change in the employer's attitude toward plaintiff after he . . . engaged in protected activity." *Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013), *aff'd*, 768 F.3d 786 (8th Cir. 2014).

Here, Logsdon points to "shifting explanations" by the railroad which, he argues, precludes summary judgment. Specifically, Logsdon contends that the railroad knew of certain inconsistencies in his January 16 incident report soon after that report was submitted. Filing 126 at 36-37. But the railroad, at least initially, never formally acted on that information. Filing 126 at 37. Thus, he claims, the railroad's reliance on alleged dishonesty months after the fact is merely pretext for an otherwise discriminatory action. Filing 126 at 37.

But this argument misconstrues BNSF's purported justification for the adverse employment action. After all, the investigation that resulted in Logsdon's termination was not premised on alleged inconsistencies in Logsdon's January 16 incident report. Rather, it was based on inconsistencies between the incident report itself, and Logsdon's subsequent statements to a BNSF claims administrator. *See* filing 130 at 19. And based on the evidence adduced, it appears that BNSF took action soon after discovering such discrepancies. Indeed, the statements giving rise to the investigation occurred on May 29, 2013, when Logsdon met with BNSF's claims administrator. Filing 126 at 4. By July, the contradictory statements had reached Luz Esquivel, the superintendent of the Alliance facility. Filing 124. And soon thereafter, on July 24, 2013, Logsdon received the notice of investigation, which informed him of the upcoming hearing. Filing 126 at 5. So, while inconsistencies in the January 16 incident report may have contributed to the railroad's finding of "dishonesty," they were not—as

Logsdon now claims—the railroad's sole justification for his dismissal. Logsdon's "shifting explanation" argument is without merit.

## 2. ADDITIONAL EVIDENCE OF PRETEXT

The gravamen of Logsdon's argument, however, is that Callahan and Esquivel worked to conceal the true cause of his alleged injury. This nefarious conduct, Logsdon alleges, was motivated by a broader desire to reduce "reportable" injuries, and thus secure managerial bonuses and railroad safety awards. Filing 126 at 39. Further, Logsdon argues, Callahan was under immense pressure from BNSF to reduce workplace injuries in the Alliance facility, particularly in light of the 2012 death of a BNSF carman. Filing 127-2 at 6. These pressures, coupled with monetary incentives, explain Callahan's "manic" behavior during his January 16 interaction with Logsdon. Filing 126 at 39.

It may (or may not) be true, as Logsdon alleges, that Callahan took proactive and improper measures to ensure that the underlying injury was not reportable. And if that is the case, then Logsdon's alleged dishonesty may be directly traceable to pressures exerted by a BNSF manager. *See* filing 126 at 39-40. But the question here is *not* whether Callahan acted improperly during his January 16 interaction with Logsdon.[6] Rather it is whether Logsdon's dismissal was motivated by intentional retaliation or discriminatory animus for reporting a personal injury. *See Kuduk*, 768 F.3d at 791. Stated another way, the issue is whether the decisionmaker who decided to fire Logsdon was motivated by a desire to retaliate against Logsdon simply for his protected conduct. And based on the evidence

---

[6] It should be noted that Logsdon sued Callahan, as well as BNSF, for violations of the FRSA. But he later dismissed his claim against Callahan in his individual capacity as time-barred.

adduced, no reasonable jury could answer that question in the affirmative.

As noted above, it was Derek Cargill and Brandon Mabry—not Callahan and Esquivel—who ultimately decided to terminate Logsdon's employment. *See*, filing 125-10 at 5; filing 125-16 at 1. And that decision followed a thorough investigation, in which the railroad collected evidence and interviewed witnesses regarding Logsdon's alleged dishonesty. Once that evidence was collected, it was sent to Cargill, who recommended termination based on various inconsistencies in Logsdon's reporting of the underlying injury. Further, Cargill viewed Logsdon's allegations against Callahan

> as essentially an affirmative defense that Mr. Logsdon had raised, and I compared it to the testimony of Mr. Callahan. And, you know, at that point, it – in my view, it came down to a determination of the credibility of the two witnesses. . . . I found that Mr. Callahan's testimony was unequivocal [and] that did not occur and – and that he did not harass or try to intimidate Mr. Logsdon. And on – on the other hand, I ultimately did not find Mr. Logsdon to be a credible witness.

Filing 125-10 at 9. Cargill's recommendation was then sent to Mabry, who—like Cargill—determined that the "dishonesty" charge was supported by substantial evidence, and that the investigation otherwise complied with established PEPA policies. *See* filing 125-16 at 1-2.

This evidence, and the record more broadly, establishes that Cargill and Mabry thoroughly considered the events leading up to Logsdon's termination, and determined that he had, in fact, been dishonest in his reporting. And while that decision may, or may not, have been correct, there is no evidence that it was in made in bad faith, or was otherwise motivated

by some retaliatory motive or discriminatory animus. *Heim*, 849 F.3d at 727; *Mayberry v. Vought Aircraft Co.*, 55 F. 3d 1086, 1097 (5th Cir. 1995) ("[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive"). Without such evidence, it cannot be said that Logsdon's protected activity contributed, in whole or in part, to the adverse employment action. Accordingly, BNSF is entitled to summary judgment on Logsdon's claim under the FRSA.

## CONCLUSION

BNSF's motion for summary judgment (filing 123) is granted in part, and denied in part. Specifically, Logsdon may proceed with his claim under the Federal Employers' Liability Act for alleged injuries to his back and chest. However, Logsdon's claim under the Federal Railroad Safety Act will be dismissed.

IT IS ORDERED:

1. BNSF's motion for summary judgment (filing 123) is granted in part, and denied in part, as set forth above.
2. Logsdon's claim under the FRSA is dismissed.
3. BNSF's motion for leave to file supplemental authority (filing 142) is denied as moot.

Dated this 30th day of June, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge